Lori PULIAFICO, Plaintiff,

v.

**COUNTY OF SAN BERNARDINO, Deputy Allen Slack, in his individual and official capacity; Timothy Nichols, in his individuals and official capacity; Deputy Peterson, in his individual and official capacity; David Lau, in his individual and official capacity; Robert Guillen, in his individual and official capacity; Deputy Drew Wiley, in**

his individual and official capacity; Deputy J. Pacewiczh, in his individual and official capacity; Deputy Holly Howell, in her individual and official capacity; and Does 2–20, inclusive, Defendants.

No. EDCV 96–02–71 RT (VAPx).

United States District Court,
C.D. California,
Eastern Division.

April 12, 1999.

E. Thomas Barham, Jr., Shirley A. Ostrow, Law Offices of Barham and Ostrow, Los Alamitos, CA, for plaintiff.

Stephen Miller, Law Offices of Bruggeman, Smith & Peckham, LLP, San Bernardino, CA, for defendants.

TIMLIN, District Judge.

Plaintiff Lori Puliafico (plaintiff) seeks damages pursuant to 42 U.S.C. § 1983 (section 1983) against the County of San Bernardino (County) and several members of its Sheriff's Department.[1] Currently before the Court are (1) cross-motions for summary adjudication of certain issues re-

---

1. The officer defendants, sued in both their individual and official capacities, are Allen Slack (Slack), Timothy Nichols (Nichols), Scott Petersen (sued as "Deputy Petersen") (Petersen), David Lau (Lau), Robert Guillen (Guillen), Drew Wiley (Wiley), Jonathan Pacewiczh (Pacewiczh) (sued as "J. Pacewiczh") and Holly Howell (Howell).

lating to the legal validity of plaintiff's detention and arrest by the individual defendants, (2) the individual defendants' motion for summary judgment on the grounds of qualified immunity, and (3) all defendants' motion to bifurcate the trial.

## I.

## BACKGROUND[2]

On July 14, 1995, officers of the San Bernardino County Sheriff's Department and other law enforcement personnel discovered a methamphetamine laboratory during a consent search of private property in the High Desert area. Soon after the officers discovered the drug lab, plaintiff arrived at the property driving her domestic partner's recently purchased pickup truck. Plaintiff was detained by the officers, and a search of the passenger compartment of the pickup yielded a PR24 police baton, illegal under California law for a private citizen to possess. Plaintiff was held for roughly two hours at the site, and then taken to county jail on suspicion of participation in the manufacture of methamphetamine. Plaintiff spent four days in custody. No charges were ever filed.

Plaintiff filed this action pursuant to section 1983, alleging that the various individual defendants deprived her of her Fourth and Fourteenth Amendments rights, and that the County defendant was liable under *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), for its custom, policy and practice of not properly training its deputies regarding the constitutional principles governing detentions and arrests.

2. The background is based on uncontroverted facts.

3. Defendants are represented by the same counsel, and, for the most part, have brought these motions simply as "defendants." Plaintiff has not challenged this practice, and accordingly, the Court will address the motions without identifying which particular defendants have properly joined them.

4. Neither defendants' motion for summary judgment nor defendants' request for sum-

By the instant motions, plaintiff seeks summary adjudication of the following issues: (1) that defendant Howell stopped and detained plaintiff without reasonable suspicion; (2) that defendant Pacewiczh detained plaintiff without reasonable suspicion and that such detention amounted to a de facto arrest without probable cause; (3) that defendants Slack and Guillen arrested plaintiff for manufacturing methamphetamine without probable cause to believe she had committed that crime; and (4) that defendant Wiley ordered the arrest of plaintiff for manufacturing methamphetamine without probable cause to believe she had committed that crime.

Defendants'[3] oppositions to plaintiff's motions requests summary adjudication of the following issues: (1) that the initial stop and detention of plaintiff was lawful; (2) that the subsequent search of the pickup driven by plaintiff was lawful; (3) that the detention of plaintiff was lawful based upon either reasonable suspicion or probable cause; (4) that the arrest of plaintiff was lawful; and (5) that the individual defendants are shielded from liability on the basis of qualified immunity.

In addition, by separate motion, defendants request summary judgment based on grounds (1), (2) and (4) from the previous paragraph, and based on the fact that a determination of probable cause was made by a judicial officer after less than 48 hours of incarceration. Also by separate motion, all defendants move to bifurcate the trial.[4]

mary adjudication of issues (contained in defendants' opposition to plaintiff's motion for summary adjudication of issues) requests summary judgment based on, or summary adjudication of, the issue of the County's liability under *Monell* for its deliberate indifference. Thus, despite the fact that the parties brief the issue in their memoranda of points and authorities in support of and in opposition to defendants' motion for summary judgement, the Court does not decide the issue. *See* Fed.R.Civ.P. 7(b)(1).

## II.

### EVIDENTIARY OBJECTIONS

Defendants submitted objections to evidence submitted by plaintiff. *See* Defendants' Objections to Evidence in re Plaintiff's Motion for Summary Adjudication. The rulings are as follows:

1. Overruled.
2. Overruled.
3. Overruled.
4. Overruled.
5. Overruled.
6. Overruled.
7. Overruled.

Defendants further object to evidence submitted by plaintiff in opposition to defendants motion for summary judgment. *See* Defendants' Objections to Plaintiff's Exhibits Filed in Opposition to Defendants' Motion for Summary Judgment. The rulings are as follows:

1. Overruled.
2. Sustained.
3. Overruled.
4. Overruled.
5. Sustained.
6. Sustained.
7. Overruled.
8. Overruled.

Defendants' requests that the Court take judicial notice of (1) certain San Bernardino County Ordinances and (2) the "Probable Cause Determination" concerning plaintiff's arrest are granted.

Plaintiff objects to certain evidence submitted by Defendants. *See* Plaintiff's Objections to Evidence in Defendants' Motion for Summary Adjudication of Issues. The rulings are as follows: [5]

1. Overruled.[6]
2. Overruled.
3. Overruled.
4. Overruled.
6. Overruled.
8. Overruled.
9. Overruled.[7]
10. Overruled.
11. Overruled.
12. Overruled.
13. Overruled.
14. Overruled.
18. Overruled.
19. Overruled.
21. Sustained as to Pacewiczh's statement that Strause was well known to other law enforcement officers— lack of foundation; otherwise overruled.

---

**5.** Plaintiff's general objection that self-serving litigation-generated declarations should be stricken goes to weight and credibility, not admissibility, and is overruled.

Where the same objection to the same evidence is made more than one time, the Court relies on its initial ruling without repeating or referencing that ruling.

Plaintiff objects to various declarations on the grounds that such declarations constitute inadmissible opinion testimony by an improperly qualified expert under *United States v. Figueroa–Lopez,* 125 F.3d 1241 (9th Cir.1997). The Court does not rely on these declarations for any improper "expert opinion" purpose, although the Court does consider the declarations in evaluating the declarants' states of mind.

**6.** Plaintiff repeatedly objects that deposition testimony lacks foundation or is irrelevant because there is no evidence that the defendants were aware of the substance of that

testimony when they detained and arrested her. The Court overrules these objections because foundation goes to the *deponent's* knowledge of a particular fact, and evidence need only tend to make a material fact more or less probable to be relevant. *See* Fed. R.Evid. 401. Under this standard, virtually all of the challenged testimony is relevant. For example, testimony relating to plaintiff's connection to the property and its residents, even if not known to the officers at the time of plaintiff's detention and arrest, has some bearing on the question of whether or not plaintiff made suspicious or inconsistent statements to the police when she arrived at the scene.

**7.** Objections to defendants' characterizations of various deponent's testimony are overruled. Counsel's characterizations of evidence are not, themselves, evidence and such characterizations have not been considered by the Court.

22. Sustained as to Pacewiczh's statement that Strause was well known to other law enforcement officers—lack of foundation; otherwise overruled.

23. Overruled.

25. Overruled.

28. Overruled.

29. Sustained as to testimony that purports to describe common practice among methamphetamine manufacturers—lack of foundation; overruled as to testimony that describes the detaining and arresting officers' beliefs as to those practices at the time of the conduct complained of.

30. Overruled.

32. Overruled.

33. Overruled.

34. Overruled.

35. Sustained as to Sanchez' testimony—irrelevant as she has been dismissed from the case; sustained as to Wiley's testimony—lack of foundation; otherwise overruled.

The parties dispute the procedural regularity of certain filings, which arguably exceed the page limits set by local rule. The Court has considered all previously filed documents pertinent to these motions. The Court does observe, however, that the voluminous briefing of the various motions considered here is highly repetitive. The parties are urged to avoid such redundant briefing in the future, and are cautioned that over-length documents will not be regularly allowed.

## III.

### UNCONTROVERTED MATERIAL FACTS

Although many important facts remain disputed at this point in the litigation, the following basic facts are uncontroverted, material and supported by admissible evidence. Additional facts relevant to the particular issues raised by the parties' motions will be discussed in the body of this order.

On July 14, 1995, a task force consisting of officers from the San Bernardino County Sheriff's Department and other law enforcement agencies was operating in the High Desert area of San Bernardino County. The team was supervised by defendant Pacewiczh, and consisted, in part, of defendants Petersen, Slack, Nichols and Howell.[8]

Sometime after 1:00 p.m., the team arrived at a 10–acre, fenced compound, referred to by all parties as Buckthorne Canyon Wash. The compound is accessible only by dirt road, and is roughly 10 miles from the town of Adelanto. The compound contained numerous automobiles and automobile parts, in various states of disrepair, and several trailers which were apparently occupied. The property had been previously involved in car theft activity, and the task force hoped to obtain consent to conduct a search.

After entering the premises, the team discovered a methamphetamine laboratory, and also discovered a quantity of what was initially believed to be freshly manufactured methamphetamine in the possession of one of the occupants. Several individuals at the scene of the search were detained for investigation. Because of the discovery of the methamphetamine laboratory, a narcotics task force, which was also operating in the desert that day, was called in. This task force was led by defendant Wiley, and included defendant Guillen.

Soon after the laboratory was found, and before the officers had notified their command center that they were "Code 4"—i.e. had safely secured the premises—plaintiff arrived at the compound driving a recently purchased pickup truck which belonged to her domestic partner.[9] Plaintiff drove up

---

8. Other members of the team included state parole officer Juanita Sanchez (Sanchez), a probation supervisor, a welfare fraud agent, and another deputy sheriff.

9. The Court notes the existence of a factual dispute as to the time of plaintiff's arrival in relation to the time of the task force's arrival.

to the compound, observed the law enforcement activity, and stopped inside the fenceline. The amount of time she waited before contact with any of the deputies is unclear, although it appears to have been somewhere between 1 and 3 minutes.[10]

Plaintiff was flagged into the compound and approached by defendant Howell and Sanchez, who were on foot. Howell asked for plaintiff's license and the truck's registration. The truck was registered to Barry Woods, and plaintiff explained that Woods was her domestic partner and that she lived with him.

Although the chronological order of the following events is disputed, it is uncontroverted that plaintiff was asked (or told) to exit her vehicle, that Howell learned that Woods was a State Corrections Officer, and that Howell discovered Woods' uniform shirt and a PR24 side-handled police baton in the truck. Possession of such a baton by a private citizen may violate California law, and at least some of the deputies at the search site were aware of this fact.[11]

Plaintiff explained to the officers that the gear belonged to Woods, who could legally possess it and in fact was required to keep the equipment with him when off duty. She also stated that she had come to the compound on a pre-arranged visit to buy a bedliner for the pickup from an acquaintance who lived there, although again there is a factual dispute as to precisely what she said and the logical consistency of her explanation for her presence at the site. Finally, plaintiff acknowledge that she had been arrested for a methamphetamine offense roughly 10 years earlier. Pacewiczh was told by Sanchez that the acquaintance named by plaintiff was involved with drugs.

Woods' truck was searched—the presence or absence of consent to search is disputed—which revealed that one of the factory made storage compartments was empty, although Pacewiczh expected to find tire equipment in that compartment.[12] The truck contained no contraband, was very clean, and the key was a single ignition key on its own ring. Woods' employment as a corrections officer was confirmed just after 2:00 p.m.

Officer Pacewiczh ordered plaintiff be detained until the narcotics team arrived. Defendant Wiley from the narcotics team arrived at the compound at roughly 3:30 p.m., and, without having spoken to plaintiff, ordered plaintiff's arrest at 4:00 p.m for violation of California Health and Safety Code section 11379.6 (section 11379.6), which proscribes manufacturing methamphetamine. Plaintiff was formally arrested by defendants Guillen and Slack pursuant to Wiley's direction and taken to San Bernardino County Jail, where she was booked by defendant Nichols.[13]

At 12:40 p.m., on the next day, July 15, a judicial officer was presented with a decla-

---

**10.** All parties generally agree that plaintiff stopped inside the gate for a brief period of time, although defendant takes contradictory positions on this question, noting that one witness claims plaintiff drove right into the center of the compound as if "she knew exactly where she was going and what for." *Compare* Defendants' Statement of Genuine Issues in Opposition to Plaintiff's Motion for Summary Adjudication at 11 (plaintiff drove right in) *with* Defendants' Statement of Uncontroverted Facts and Conclusions of Law at 4 (plaintiff "pulled in and stopped about two car lengths inside the fence"). Because defendants, in their later-filed papers, appear to have abandoned their reliance on the testimony that plaintiff "drove right in," the Court treats the stop-waited fact as undisputed.

**11.** The locations of the shirt and baton when discovered are disputed. Defendants suggest the shirt was hanging behind the driver's seat of the truck; plaintiff states it was with Woods' other gear on the floor of the rear of the truck. Similarly, one officer believes the baton was on the passenger seat of the car, another suggests it was behind the seat, and plaintiff declares it was behind the seat.

**12.** There is a factual dispute as to whether or not the tire equipment was elsewhere in the truck that day.

**13.** Defendant Lau's role in plaintiff's arrest is unclear. Plaintiff simply states that Lau "was also involved in Plaintiff's arrest." *See* Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 8.

ration, signed by officer Slack, falsely stating that plaintiff was at the compound when the methamphetamine laboratory was discovered. On the basis of this declaration, the judicial officer determined that there was probable cause to believe that plaintiff had committed a crime and plaintiff was further retained in custody.

On July 18, 1995, after four days of incarceration, plaintiff was released from custody.

## IV.

## ANALYSIS

### 1. Legal Standards

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On summary judgment, "the judge does not weigh conflicting evidence with respect to a disputed material fact. Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial. Therefore, at summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 630–31 (9th Cir.1987) (citations omitted). Where the evidence construed in favor of the nonmoving party allows for only one result under the governing substantive law, the moving party is entitled to summary judgment.

### 2. The Initial Stop and Detention of Plaintiff

Plaintiff, based on the uncontroverted facts, requests summary adjudication as a matter of law that Officer Howell lacked the reasonable suspicion required by the federal Constitution, as construed in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), when Howell flagged her into the compound, stopped her, and requested her license and the vehicle's registration. Defendants seek a contrary summary adjudication—that Howell did have reasonable suspicion to engage in such conduct—and in the alternative request summary judgment on the grounds that Howell is shielded from liability for her conduct by the doctrine of qualified immunity.

 Under *Terry* and its progeny, a brief, investigatory stop of those suspected of involvement in criminal activity is permissible if based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. This "reasonable suspicion," while less than probable cause, must be more than an "unparticularized suspicion or 'hunch.'" *Id.* at 27, 88 S.Ct. at 1883.

 Even if the Court concludes that Howell's stop and detention of plaintiff was not based on "specific and articulable" facts pointing to plaintiff's potential involvement in criminal conduct, Howell may still avoid liability for damages in this section 1983 action under the doctrine of qualified immunity. To determine whether a public official is entitled to qualified immunity, the Court asks "whether reasonable officers could have believed their conduct lawful under the clearly established principles of law governing that conduct." *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1319 (9th Cir.1995).[14]

14. In *Alexander*, the Ninth Circuit offered a one-step formulation of the test; in *Act/Up!*

 The Court will grant defendants' motion for summary adjudication of the issue of Howell's reasonable suspicion to stop, detain and briefly question plaintiff. Further, the Court concludes that Howell is qualifiedly immune from damages liability under section 1983 for her conduct during the initial· stop, detention and investigative questioning of plaintiff. Resolving all factual disputes and drawing all reasonable inferences in plaintiff's favor, and considering all of the uncontroverted facts, the Court concludes, as a matter of law, that a reasonable officer could have believed she did not violate clearly established federal law by stopping, detaining and briefly questioning plaintiff under these circumstances.

On plaintiff's view of the evidence, she arrived at a suspected stolen car processing operation soon after the discovery on that property of an active methamphetamine laboratory. She turned onto the property, stopped when she observed police activity, and sat in her car for approximately one minute. At that point she was waved into the compound, stopped and detained, and asked to produce her driver's license and the truck's registration by defendant Howell.

In *United States v. Moreno*, 891 F.2d 247 (9th Cir.1989), a car pulled off the road towards a house that was being searched, the female driver looked at one of the officers at the scene, then slowly drove off. "It was reasonable for the police to make a *Terry* stop to determine why she had driven toward the house and then changed her mind at the sight of the cars and the officer." *Moreno*, 891 F.2d at 249. While

*Moreno* presents a similar situation to that under consideration here, in the instant case there was no flight by plaintiff to heighten the detaining officer's suspicion.[15] *Cf. United States v. Perdue*, 8 F.3d 1455 (10th Cir.1993) ("Since the property is rural and set back from the road, anyone driving up to the lane to the building containing the contraband was justifiably suspect. Thus, Mr. Perdue's mere arrival at the property being searched was a suspicious circumstance. When the car suddenly turned around and attempted to leave after its passengers came into view of the police activity surrounding the shed, the officers had an articulable reasonable basis for making the stop.").

*People v. Glaser*, 11 Cal.4th 354, 45 Cal. Rptr.2d 425, 902 P.2d 729 (1995), presents a closer situation. On a rainy evening in 1993, officers saw Glaser in a pickup truck drive past them as they approached a residence for which they had a search warrant. When the officers arrived at the target residence, the pickup was in the driveway. Glaser was then observed entering the rear gate into the property's backyard and was detained at gunpoint. The California Supreme Court held this detention was acceptable under *Terry*. The Court focused on the brevity of the detention, the officer safety issues presented by the simultaneous arrival of Glaser and the police, and the fact that the detention was incidental to a warranted search of the premises. In addition, the Court noted that Glaser's backyard entry suggested he was not a stranger or chance visitor. *Id.* at 365–69, 45 Cal.Rptr.2d 425, 902 P.2d 729. *See also People v. Huerta*,

---

*Portland v. Bagley*, 988 F.2d 868, 871–72 (9th Cir.1993), the Court employed a two-step formulation; in *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir.1995), the Court used a three-step analysis. In *Knox v. Southwest Airlines*, 124 F.3d 1103, 1107 n. 2 (9th cir.1997), the Court dismissed this variation as substantively irrelevant: "Regardless of any formalistic difference in description, our approach has been consistent and essentially equivalent."

15. At one point in their opposition papers, defendants assert that Howell's suspicion was

aroused because plaintiff "drove right in" to the property "as if she knew exactly where she was going." *See* Defendants' Opposition to Plaintiff's Motion for Summary Adjudication of Issues at 10. Defendants apparently would have viewed any possible action taken by plaintiff—driving right in, stopping at the gate, or flight—as giving rise to reasonable suspicion. Accordingly, the Court does not consider the directness of plaintiff's entry onto the property as particularly significant with respect to the reasonable suspicion issue.

218 Cal.App.3d 744, 267 Cal.Rptr. 243 (1990) (during warranted search of residence, defendant walked directly into apartment without knocking or announcing his presence).

In the present case, the police had no search warrant for the compound, although the significance of that fact as to the lawfulness of plaintiff's initial detention is unclear. *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), provides authority for the detention of occupants of a residence searched pursuant to a warrant, but does not suggest that the detention under consideration here was lawful only if conducted pursuant to a warranted search of the compound. In this case, there was no simultaneous arrival, which presumably decreases the danger to the police officers posed by the unknown visitor, *see Baker v. Monroe Township*, 50 F.3d 1186, 1191–92 (3d Cir. 1995), and no overt familiarity with the premises or other "backyard" entry. These cases, while helpful, do not determine the issues presented here.[16]

Moreover, other precedent suggests that mere arrival at a crime scene does not give rise to reasonable suspicion. *See United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996) (no reasonable suspicion where, upon officers' arrival at scene of speakeasy, Davis exited parked car, made and broke eye contact with an officer, walked away with hands in pocket, refusing to stop when requested, and where officers were aware of Davis' criminal record); *United States v. Clay*, 640 F.2d 157 (8th Cir.1981) (Clay arrived soon after a warranted search of a residence uncovered drugs and weapons and knocked on the door. No reasonable suspicion to order Clay inside

and pat him down, despite the fact that owner of the premises was at large and believed to be armed and dangerous, because no evidence of mistaken identity and no nexus between Clay and the contraband found on the property.).

In light of the cited cases, in consideration of the uncontroverted facts, and resolving all factual disputes in plaintiff's favor, the Court concludes as a matter of law that Howell's stop, detention and initial investigatory questioning of plaintiff was supported by specific and articulable facts as required by the federal constitution. Plaintiff's arrival during an unfolding (though relatively secure) search of a remote site containing an active methamphetamine laboratory and suspected of stolen car processing activity, provided the detaining officer with a constitutionally sufficient basis to stop and detain plaintiff, and request her driver's license and the truck's registration.

In the alternative, the Court concludes that qualified immunity shields Howell from section 1983 damages liability for her conduct during this initial stop and investigatory questioning of plaintiff. Even if ultimately found unlawful, defendant Howell's actions in stopping and detaining plaintiff, and requesting plaintiff's license and the truck's registration, under the circumstances of this case, were within the bounds of arguably reasonable police conduct and did not deprive plaintiff of any clearly established constitutional right. *Cf. Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plain-

---

16. The most on point decision may be an unpublished Ninth Circuit decision, *United States v. Carrafa*, 59 F.3d 176 (Table), 1995 WL 378685 (9th Cir.1995). Carrafa parked his car in front of a residence where officers had recently discovered methamphetamine pursuant to a warranted search. Carrafa sat in his car observing officers in the side yard for about fifteen to twenty seconds, and then was approached by officers. "[T]he officers clearly had reasonable suspicion for conduct-

ing an investigatory stop." *Id.* at *2. While this Court is not permitted to cite unpublished decisions as precedent, it only seems fair to Howell to consider the result reached by the judges in the *Carrafa* case in determining if a reasonable officer could have believed her conduct lawful under clearly established law. Even if unpublished, the decision cannot be said to result from an unreasonable interpretation of the law.

ly incompetent or those who knowingly violate the law.' ") (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 1097, 1096, 89 L.Ed.2d 271 (1986)).

Accordingly, the Court will adjudicate as a matter of law that the initial stop, detention and investigative questioning of plaintiff were supported by reasonable suspicion. It will further adjudicate as a matter of law that the individual defendants are immune from damages liability under section 1983 insofar as such liability is based on those defendants' depriving plaintiff of her Fourth Amendment rights by reason of her being initially stopped and detained by Howell.

### 3. The Search of Woods' Truck

Both parties cross-move for summary adjudication of the lawfulness of the search of the pickup. The following facts are undisputed. The compound was suspected of stolen car activity and a working methamphetamine laboratory had been found thereon when plaintiff arrived in a recently purchased pickup truck, not registered in her name. Plaintiff stated that the truck was the property of her domestic partner, who was a California corrections officer. When Howell heard that the car was owned by a police officer she asked (or told) plaintiff to exit the vehicle. After that, a police baton, illegal for plaintiff to knowingly possess, was found in the truck.

Factual disputes exist as to whether or not Woods' uniform shirt was visible from outside the truck, and as to whether the police baton was on the passenger seat or behind the seat of the truck. If the baton was on the passenger seat, as defendants contend, it legally could be seized and a brief search of the rest of the passenger compartment was lawful under *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). That case allows an officer to conduct a brief weapons search of a vehicle if the officer possesses "a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and

the suspect may gain immediate control of weapons." *Id.* at 1049, 103 S.Ct. at 3481.

■ According to plaintiff's version of the relevant facts, however, the baton was not visible but was under Woods' shirt on the floor in the rear of the truck's cab. On these facts, the lawfulness of the search depends on the validity of defendants' assertion that the combination of the drug nature of the crime scene and the fact that peace officers commonly carry weapons in their private vehicles gave rise to a reasonable, specifically articulable suspicion. It is clear that genuine, material, factual disputes exist regarding the circumstances observable to the defendants prior to the search of the pickup truck.

Howell, and several of the other officer defendants, have testified in their depositions that a peace officer's vehicle should always be considered likely to contain a weapon. *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), a highly fact-driven decision, provides some support, though not so much as defendants urge, for the proposition. Similarly, defendants' contention that Courts have acknowledged the frequent connection between drugs and weapons also finds support in the cases. *See Ybarra v. Illinois,* 444 U.S. 85, 106, 100 S.Ct. 338, 350, 62 L.Ed.2d 238 (1979) (Rehnquist, J., dissenting) ("In the narcotics business, 'firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia.' ") (quoting *United States v.. Oates,* 560 F.2d 45, 62 (2d Cir.1977)); *United States v. Stanfield,* 109 F.3d 976, 984 (4th Cir.1997) ("[W]here there are drugs, there are almost always guns."). *But cf. United States v. Powell,* 929 F.2d 724, 729 (D.C.Cir.1991) ("Even if guns were shown to be a part of an overwhelming majority of drug operations, not all drug traffickers—or drug trafficking contexts—are alike."). On this authority, defendants argue that a reasonable officer could have believed the search was lawful.

In addition, there are genuine issues of material facts as to whether plaintiff gave

defendants consent to search the truck, and, if so, when.

The Court finds that summary adjudication of the constitutionality of the search of the truck, or of the applicability of qualified immunity to the defendants who conducted the search, is not proper because the underlying predicate facts are controverted. While it may be that a deputy who stops a peace officer's private vehicle upon its approaching a rural methamphetamine laboratory could reasonably believe that she may briefly search the vehicle pursuant to *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) and *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (allowing protective searches in conjunction with in-home arrests), resolution of the factual disputes in this case is necessary before the Court could conclude as a matter of law that the search was legal or that qualified immunity applied.

### 4. The Further Detention of Plaintiff

The detention of plaintiff by defendants continued after the initial stop and questioning, during the search of the interior of the pickup truck and the officers' further questioning of her. The constitutionality of this continued detention cannot be determined until the predicate factual disputes noted above concerning the legality of the search of the truck have been resolved.

■ The Court does conclude, however, as a matter of law, that, at some point, defendants' detention of plaintiff became a *de facto* arrest, for which probable cause was required. In the Court's view, under the particular undisputed facts of this case, once plaintiff was separated from her vehicle and placed under supervision in a trailer—at which point defendants' investigation of plaintiff's connection to the property ceased—she was under arrest.

The Ninth Circuit has recently given extensive treatment to the question of when an investigatory detention becomes an arrest:

There is no bright-line rule to determine when an investigatory stop becomes an arrest. Rather, in determining whether stops have turned into arrests, courts consider the "totality of the circumstances." ... In looking at the totality of the circumstances, we consider both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justifications for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken. In short, we decide whether the police action constitutes a Terry stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable given the circumstances. As a result, we have held that while certain police actions constitute an arrest in certain circumstances, e.g., where the "suspects" are cooperative, those same actions may not constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists.

*Washington v. Lambert,* 98 F.3d 1181, 1185 (9th Cir.1996) (citations omitted).

■ The Court went on to list a number of factors relevant to the determination of when an arrest has occurred: (1) handcuffing; (2) drawn weapons; (3) restriction of physical liberty; (4) duration; (5) special circumstances such as an uncooperative suspect, information that the suspect is armed, temporal proximity to a violent crime or other information that violence is imminent; (6) the specificity of the information giving rise to the detention; and (7) the number of officers present. *Id.* at 1188–91. "The relevant inquiry is always one of reasonableness under the circumstances," *id.* at 1185 (quoting *Allen v. City of Los Angeles,* 66 F.3d 1052, 1057 (9th Cir.1995)), and "[t]he proper focus when determining coerciveness or restraint sufficient to constitute an arrest or

detention is not on the subjective belief of the agents. Rather [the Court must] review the situation from the perspective of the person seized." *Allen v. City of Portland,* 73 F.3d 232, 235 (9th Cir.1995) (quoting *United States v. Delgadillo–Velasquez,* 856 F.2d 1292 (9th Cir.1988)). Finally, "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, [it is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

In the present case, it is an uncontroverted fact that once plaintiff was sequestered in the trailer, no further investigation was done to determine her connection with the property.[17] Defendant Wiley, the narcotics officer who made the ultimate decision to "arrest" plaintiff, did not speak to her between his 3:30 arrival at the compound and his 4:00 arrest order.

Although no handcuffs or weapons or other indicia of arrest were used on plaintiff, the Court concludes as a matter of law that the prolonged detention of plaintiff for purposes of consulting the law enforcement narcotics experts resulted in her being arrested during the time of her sequestration without further investigation regarding her possible connection with the methamphetamine laboratory. The restriction of her physical liberty was substantial and lengthy, the plaintiff was completely cooperative, and the police had ample alternatives available to resolve their suspicions more quickly. The decision to wait for the narcotics team was a discretionary one; any of the officers on the scene could have questioned this suspect to ascertain her connection to the methamphetamine laboratory. This is not the case warned about in *Sharpe,* where

officers are acting in a swiftly developing situation, and should be shielded from judicial second-guessing. Construing all the evidence in defendants' favor, as the Court must do on summary judgment, plaintiff was arrested at the time stated above. *Cf. United States v. Ricardo D.,* 912 F.2d 337 (9th Cir.1990) ("taking hold of and isolating an unarmed compliant juvenile in the back of a police car [for twenty minutes] was unnecessarily coercive, and thus transformed the investigatory stop into an arrest"). There were over 10 officers at the scene, the situation was declared "Code 4" shortly after 2:00 p.m., and there were no "special circumstances" justifying the length of plaintiff's detention. Defendants' stated fear that plaintiff would leave the scene and contact "co-conspirators," while perhaps sufficient under *Lambert* to prevent a brief detention from becoming an arrest, could not justify the two hour detention of plaintiff here.

**5. Defendants Pacewiczh and Wiley lacked Probable Cause to Arrest Plaintiff**

The Court agrees with plaintiff that, as a matter of law, on any reasonable interpretation of the totality of circumstances of which defendants Pacewiczh and Wiley were aware at the time of the arrest, whether considered *de facto* or *de jure,* probable cause did not exist to arrest her for manufacturing methamphetamine. Furthermore, plaintiff's arrest may not be retroactively justified by the possible existence of probable cause to arrest for the police baton violation.

**A. Probable Cause**

 "[A] warrantless arrest [is] legal only if, at the moment of arrest, facts and circumstances within the arresting officers' knowledge and of which they [have]

**17.** Defendants argue that no further investigation was necessary because such investigation would only have served to incriminate the plaintiff and Barry Woods. The argument is specious. The fact that defendants respond to *Sharpe* by asserting that investigation would have been pointless, rather than by demonstrating what investigation was actually performed, is taken by the Court as a concession that there was no further investigation.

reasonably trustworthy information [are] sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense." *United States v. Pinion,* 800 F.2d 976, 979 (9th Cir.1986). The collective knowledge of all officers involved in a coordinated investigation must be attributed to the arresting officers.[18] *Id.* at 979 n. 1; *United States v. Bernard,* 607 F.2d 1257, 1267 (9th Cir. 1979).

Resolving all factual disputes and drawing all reasonable inferences in defendants' favor, the arresting officers were aware of or could have believed the following:

Plaintiff arrived at the remote scene of an illegal methamphetamine laboratory, where at least two suspects had already been apprehended. When she observed police activity she stopped her vehicle at the edge of the compound and sat for three minutes before being flagged into the compound. The car was registered to a male named Barry Woods, who presumably was a corrections officer because his uniform shirt was hanging visibly behind the driver's seat. Plaintiff explained to officer Howell that Woods was her domestic partner, and that they lived together.

A police baton, illegal for plaintiff to possess, was in the cab of the truck (possibly on the passenger seat). Plaintiff claimed the baton belonged to Woods, and that she did not know it was there. Officers on the scene were aware that the baton should have been with the officer to whom it had been issued.

Plaintiff claimed she had come to the compound to buy a bedliner for the truck, but she also said she had come to see a resident of the compound, who was known to at least one of the officers as a drug user. She contemporaneously claimed that she did not "know" anyone at the compound. These stories were suspiciously inconsistent. Plaintiff acknowledged a 10 year old methamphetamine conviction.

A factory installed storage compartment in the truck was empty, although one would have expected to find tire changing equipment in that compartment. None of the tires on the truck had been changed. The truck was very clean and was operated by single ignition key which was not on a ring with other keys.

A substance believed to be partially processed methamphetamine—ephedrine— was found at the compound. Plaintiff's arrival coincided with the manufacture of this substance. Plaintiff's truck "appeared" to be the only operating vehicle at the compound, although many other vehicles in various states of disrepair were on the property.

It is further uncontroverted that the officers were experienced with narcotics trafficking and distribution, and in particular were aware that: (1) the infiltration of drugs into prisons is a serious problem; (2) drug mules often use "ruses" to distract attention from their activities; and (3) methamphetamine manufacturers often process the drug partially at one site, then take it to another site for completion.

■■■ Recognizing that "[c]onduct which appears innocent to a lay person may have an entirely different significance to an experienced narcotics officer," *United States v. Hicks,* 752 F.2d 379, 384 (9th Cir.1985), the Court concludes as a matter of law, considering the totality of the circum-

---

18. The Court realizes that various officers were involved in the "arrest" of plaintiff. Defendant Pacewiczh ordered her detention in the trailer which resulted in a *de facto* arrest (see discussion above); defendant Wiley ordered her formal arrest, which was *de jure;* defendant Slack formally arrested her; defendants Slack, Guillen and Petersen, and perhaps Lau, participated in the delivery of plaintiff to the County jail. Because the probable cause issue is being resolved on plain-
tiff's motion for summary adjudication the Court will attribute knowledge of all potentially relevant facts to all of the officers without determining the precise time each fact was learned. Some facts, for example, may have been learned after plaintiff's detention in the trailer. It is the Court's conclusion, however, that even when plaintiff was formally arrested, probable cause to arrest her did not exist.

stances, that these facts of which the officers were aware, or, given their training and experience, could have been aware, do not give rise to probable cause to arrest plaintiff for manufacturing methamphetamine.

Noticeably absent from the facts described above is anything linking plaintiff to the methamphetamine laboratory found on the property other than her mere arrival at the scene. Although this arrival, even under the assumption that it coincided with the completion of a significant phase of a methamphetamine "cook," may give rise to a reasonable suspicion of plaintiff, it does not support an officer of reasonable prudence in concluding plaintiff had committed or was committing a crime involving the manufacture of methamphetamine.

Similarly, the empty tire changing compartment, while made much of by defendants' counsel, is simply too commonplace and innocuous to support a finding of probable cause, even in conjunction with the other facts listed. In addition, plaintiff's 10 year old methamphetamine conviction is too insubstantial to add much to the probable cause mix. Although it is true that probable cause exists where a "succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one," *United States v. Bernard,* 607 F.2d 1257, 1267 (9th Cir. 1979), here, it was not reasonable for the officers to conclude on these (assumed) facts that "an innocent course of conduct was substantially less likely than a criminal one." [19] Defendants' theory that plaintiff and Woods were smuggling drugs into prison is simply too speculative to have supported any substantial restraint on plaintiff's liberty.

Defendants point to no case in which probable cause to arrest was found on facts such as these. In *United States v. Hillison,* 733 F.2d 692 (9th Cir.1984), a divided court of appeals upheld the arrest of defendant Mansfield on the following facts: The police had conducted two days of surveillance of Mansfield, Hillison, and Jacobson, and the three men were very closely associated, sharing Mansfield's car and each other's adjacent motel rooms. Mansfield had used one name to rent his car, and a different name to rent his motel room. After Mansfield split off from the other two defendants, those men were arrested (based on the lawful discovery of cocaine in a package they had mailed) and found to possess a large amount of cocaine. Two members of the panel found that the experienced DEA agents had probable cause based on Mansfield's contemporaneous, close association with known criminal activity and his use of multiple names. Judge Fletcher dissented on this point, arguing that Mansfield's association with the other defendants constituted "mere propinquity," insufficient to establish probable cause. *Id.* at 698–99.

*Hillison* was a close case, and the facts here provide far less information upon which the officers could justify their arrest of plaintiff at the time she was arrested. Critically absent is evidence of any association by plaintiff with the methamphetamine laboratory operators. The *Hillison* court found it prudent to rely on the judgment of experienced DEA agents, but only after those agents demonstrated that they had made a reasonably extensive investigation. In our case, despite ample opportunity, the defendants engaged in no investigation of plaintiff once she was detained and sequestered in the trailer.

Further, the *Hillison* court stressed that association with criminal activity is more indicative of probable cause where the activity is such that "it could not be carried on without the knowledge of all

---

19. Defendants repeatedly point out that Woods' truck was very clean and was operated by single key not on a ring with any other keys. In the Court's view, a reasonably pru-

dent officer could not ascribe criminal significance to these facts under the circumstances of this case.

persons present." *Hillison,* 733 F.2d at 697. The Buckthorne Canyon Wash compound was so cluttered that defendants have argued it constituted a junkyard under the San Bernardino County Code. *See* Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment at 42. It may be reasonably inferred that visitors to such a property could be unaware of the contents of one camper shell on the premises.

In *United States v. Williams,* 630 F.2d 1322 (9th Cir.1980), the arresting officers had seen two cars and a motor home traveling together. One of the cars, later seen traveling alone, was stopped by the police for suspicious activity, and the officer was told that the driver's uncle, who was in the motor home, had the key to the trunk. The officer located the motor home, and the uncle, Williams, gave inconsistent answers to the officer's questions, and denied having the key. Eventually, the officer returned to the car and found methamphetamine manufacturing equipment in the trunk. He then returned to the mobile home, suspecting it was a drug lab, and arrested the occupants.

In *Williams,* the defendants had been directly linked to the contraband in the stopped car, both by the officer, who had seen the vehicles traveling in tandem, and by the driver of the stopped car, who had specifically identified Williams as having control over the trunk. In the present case, the only association between plaintiff and the crime scene was her mere arrival, and there was no evidence at all actually connecting her to the clandestine laboratory located in a camper shell on the premises.

Another self-described "close case" where probable cause was found is *United States v. Pinion,* 800 F.2d 976 (9th Cir. 1986). Within half an hour of a bank robbery, Pinion was arrested a few blocks from the bank. He matched the general description of the robber, although his clothes were somewhat different. He had been seen running through the neighborhood carrying a bag. The robber had been carrying a bag. He had also gone to the door of a residence, and asked to use the telephone, claiming to have been assaulted.

When the officer drove slowly past Pinion, Pinion "studiously" ignored him, which was considered suspicious given the claim that Pinion had just been assaulted. "Although ambiguous conduct of a person found in the proximity of the scene of a crime does not establish probable cause, Pinion's behavior in this case was more than ambiguous; it was suspicious and conformed to conduct of a suspect fleeing a robbery." *Id.* at 980. Pinion's conduct was far more suspicious than plaintiff's here, even drawing all reasonable inferences in defendants' favor.

*United States v. Robertson,* 833 F.2d 777 (9th Cir.1987), relied on by plaintiff, presents a much closer fact situation. In that case, police in possession of a warrant for the arrest of a suspected occupant approached a suspected methamphetamine laboratory that was located in a house. The windows were fully curtained, and the garage windows were completely masked. A pick-up truck registered to an individual with a drug record was parked by the house.

As the police approached to execute the warrant, they saw two persons—a woman exiting the house, and a man standing inside the doorway. On seeing the officers the man stepped back and slammed the door; the police drew their weapons and ordered the woman to freeze. The Ninth Circuit held that this constituted an arrest of the woman, for which probable cause was lacking.[20] No information, other than her recent exit from the premises, connected the woman to the suspected drug lab or the target of the arrest warrant. *Id.* at 782–83.

---

**20.** Judge Noonan dissented on this point, based on his conclusion that the encounter constituted a *Terry* stop and was adequately based on reasonable suspicion. *Id.* at 786–88 (Noonan, J., dissenting).

Potentially distinguishing *Robertson* from the present case are (1) plaintiff's 10 year old drug conviction[21]; (2) the actual discovery, rather than the officer's strong suspicion, that the premises contained a methamphetamine laboratory; (3) plaintiff's purportedly inconsistent statements that she was at the scene to pick up the bedliner, and to see a resident; (4) the police baton in plaintiff's car; and (5) the empty tire compartment in the vehicle. In the Court's view, none of these circumstances, considered individually or collectively, connect plaintiff to the methamphetamine laboratory found at Buckthorne Canyon Wash in any meaningful way, and no officer of reasonable prudence could have concluded otherwise. *See also United States v. Soyland,* 3 F.3d 1312 (9th Cir.1993) (no probable cause to search passenger in car where methamphetamine odor detected, but only marijuana found in car); *United States v. Vaughan,* 718 F.2d 332 (9th Cir.1983) (no probable cause to arrest passenger in car with two arrest warrant targets, despite the fact he tried to leave the scene); *United States v. Tate,* 694 F.2d 1217 (9th cir.1982) (no reasonable suspicion to detain occupants of vehicle seen leaving suspected methamphetamine laboratory, despite the fact they were seen at the facility moving containers wearing gloves), *vacated and remanded on other grounds by United States v. Tate,* 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 873 (1984); *United States v. Strickler,* 490 F.2d 378 (9th cir.1974) (no probable cause to arrest where police had information of location of drug transaction; defendant's car approached location and slowed, then drove away, then drove past again, then

parked; defendant and others sat in car observing the location for roughly 30 minutes).

*United States v. Baron,* 860 F.2d 911 (9th Cir.1988), cited by defendants, is easily distinguishable. In that case drug agents lawfully intercepted a package of cocaine, marked it with an electronic beeper, and arranged for a controlled delivery to the addressee. That man took the package into his apartment, then quickly left "with a suspicious bulge in the leg of his shorts about the size of the plastic bag containing the [contraband]," and visited Baron and her boyfriend. They promptly returned with him to his apartment. After 10 minutes, Baron and her boyfriend observed a surveilling agent from the apartment's porch and notified the initial suspect, at which point the beeper was destroyed. Within minutes, the three left the apartment, and Baron and her boyfriend were detained. *Id.* at 912.

The Ninth Circuit described this as a "close question," but found the agents had probable cause to arrest Baron for involvement in a conspiracy to possess and distribute the cocaine. *Id.* at 917. Baron engaged in a course of conduct far more suspicious than that of plaintiff in the present case. If that case was "close," this one is not.[22]

Thus, the Court concludes as a matter of law that defendants Pacewiczh and Wiley did not have probable cause to arrest or order the arrest of plaintiff for violation of section 11379.6 and it will grant plaintiff's motion for summary adjudication of this

---

21. Plaintiff contends this was not a conviction, but an arrest and successful diversion pursuant to California Pen.Code § 1003. For purposes of this motion, however, the Court will accept defendants' characterization of plaintiff's admission at the scene.

22. The factors most heavily relied on to support defendants' actions—the need to secure the premises and the officer's desire to prevent plaintiff from leaving and notifying other "conspirators" of the presence of the police at the compound—are basically irrelevant to the

probable cause and qualified immunity determinations. Certainly these factors, and the officer safety issues they raise, justified a brief detention of plaintiff until the situation was secure and her connection or non-connection to the property was ascertained. Once it was determined that plaintiff had no readily ascertainable connection to the methamphetamine laboratory, she should have been released. Brief detention of plaintiff pending further investigation of her may have been reasonable; arrest and incarceration was not.

issue and deny defendants' contrary motion for summary adjudication.

## B. Defendants Cannot Rely on the Baton "Violation" to Justify the Arrest

Defendants urge that if there was no probable cause to arrest plaintiff for manufacturing methamphetamine, there was probable cause to arrest her for possession of a police baton. The problem with this argument is that plaintiff unequivocally was not arrested for that (assumed) offense. She was clearly booked for suspicion of violation of section 11379.6, and this was the offense relied on by the judicial officer in reaching the probable cause determination. Defendants do not suggest otherwise, instead arguing that because plaintiff could have been arrested for that offense, she may not complain because she was erroneously arrested for a different offense.

 This view finds no support in the cases. *Gasho v. United States*, 39 F.3d 1420, 1428 n. 6 (9th Cir.1994), *Vance v. Nunnery*, 137 F.3d 270, 273–77 (5th Cir.1998), and *Santiago v. Fenton*, 891 F.2d 373, 385–86 (1st Cir.1989) make clear that the modern rule is that only where the uncharged offense is "closely related" to the charged offense, and "involves the same conduct" as that offense, can a different crime supply the probable cause necessary to retroactively justify an unconstitutional arrest. *Gasho*, 39 F.3d at 1428 n. 6. Here, the baton-possession offense was completely separate from the methamphetamine manufacturing offense, and cannot justify the arrest of plaintiff for the latter crime. *Cf. Avery v. King*, 110 F.3d 12, 14–15 (6th Cir.1997) (offense of "willfully obstructing a police officer" closely related to offense of "forcibly impeding a police officer"); *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir.1990) (offense of "disorderly conduct" closely related to offense of "criminal trespass"); *Gasho*, 39

F.3d at 1428 (offenses of "removal of property to prevent seizure" and "forcible rescue of seized property" closely related to offense of "unlawful removal of property under the control or custody of Customs"). As in *Vance*, the failure of the police to question plaintiff or otherwise investigate the purportedly related offense, and the complete absence of any reference to this conduct in the incident reports, booking papers and probable cause determination raises the risk of an improper "ex post facto" justification which would "unduly narrow the scope of the Fourth Amendment's protection against sham arrests." *Vance*, 137 F.3d at 276.

*In re Donald L.*, 81 Cal.App.3d 770, 146 Cal.Rptr. 720 (1978), requires no different result. The language in that case relied on by defendants is dicta, and addresses the different issue of when contraband discovered during a search incident to an arrest must be suppressed because the arrest lacked probable cause.

Consequently, the defendants did not have probable cause to arrest plaintiff based on the offense of illegal possession of a police baton, which was not the stated basis for her arrest.[23]

Anticipating this conclusion, defendants contend that, even if the arrest of plaintiff on these facts was unlawful, a reasonable officer could have believed that, under clearly established law, she did have probable cause to arrest plaintiff for manufacturing methamphetamine. Accordingly, the individual defendants argue, regardless of the Court's determination of the probable cause issue, the doctrine of qualified immunity shields them from liability for plaintiff's arrest. The Court disagrees.

As discussed above, to determine whether the individual defendants are qualifiedly immune from section 1983 damages liability for arresting plaintiff without probable cause, the Court asks "whether reasonable

**23.** Given the Court's resolution of this issue, it need not address plaintiff's argument, based on *People v. Oskins*, 69 Cal.App.4th 126, 81 Cal.Rptr.2d 383 (1999), that the defendants

would have lacked probable cause to arrest her for the baton violation had they attempted to do so.

officers could have believed their conduct lawful under the clearly established principles of law governing that conduct." *Alexander*, 64 F.3d at 1319. Defendants make no argument that the law governing probable cause to arrest was not clearly established at the time of plaintiff's arrest, nor could they. *See Kennedy v. Los Angeles Police Dep't*, 887 F.2d 920, 924 (9th Cir. 1989) ("It is clearly established, of course, that an arrest without probable cause violates the Constitution."). Rather, defendants contend that, in consideration of the all of the circumstances of plaintiff's presence at the compound, they could have reasonably believed probable cause existed to arrest her.

Construing the facts in plaintiff's favor, as the Court must do on defendants' motion for summary judgment on qualified immunity grounds, the Court concludes as a matter of law that a reasonable officer could not have believed probable cause existed to arrest plaintiff for manufacturing methamphetamine. None of the circumstances recited in detail above, construed in plaintiff's favor, sufficiently connect plaintiff to the methamphetamine laboratory or its operators to support a reasonable officer in believing that plaintiff had committed or was committing the crime of manufacturing methamphetamine.

The cases relied on by defendants in arguing that a reasonable officer could have believed that probable cause existed to arrest plaintiff are either factually distinguishable—*see Moreno*, 891 F.2d at 249 (suspect fled at sight of police surrounding house where cocaine and large amount of cash had been found; police detained her for questioning and then learned that she lived at that house)—or deal with reasonable suspicion, not probable cause—*see Glaser*, 11 Cal.4th at 362–65, 45 Cal. Rptr.2d at 428–30, 902 P.2d 729 (reasonable suspicion to initially detain suspect); *Huerta*, 218 Cal.App.3d at 750, 267 Cal. Rptr. at 247 (reasonable suspicion to de-

tain occupant of house searched pursuant to a warrant). These decisions do not support a conclusion that, under clearly established law, a reasonable officer could have believed that probable cause existed to arrest plaintiff for manufacturing methamphetamine under the circumstances of this case. Defendants' motion for summary judgment on qualified immunity grounds will be denied.[24]

The Court also rejects defendants' arguments concerning the judicial officer's probable cause determination reflected in the "Probable Cause Declaration" submitted in support of defendants' motion for summary judgment. The judicial officer was presented with an incomplete (and affirmatively inaccurate) statement of the facts relevant to plaintiff's arrest. The judicial officer's determination of probable cause is, thus, marginally relevant, at best, and is completely unpersuasive on the question of the individual defendants being qualifiedly immune from a section 1983 damages action for arresting plaintiff without probable cause.

### 6. Defendants' Motion to Bifurcate

Defendants move to bifurcate during trial the *Monell* issue and the issue of the amount, if any, of punitive damages, from the issues of liability, causation, compensatory damages and liability for punitive damages of the individual defendants. The Court finds this motion to be premature. Bifurcation issues shall be considered at the pre-trial conference in this action. The instant motion to bifurcate will be denied without prejudice.

### V.

### DISPOSITION

ACCORDINGLY, IT IS
ORDERED THAT:

1. Plaintiff's motion for summary adjudication that Howell stopped and de-

---

**24.** Plaintiff has not moved for summary adjudication of the absence of qualified immunity.

Accordingly, the Court does not address the issue.

tained her without reasonable suspicion is denied.

2. Plaintiff's motion for summary adjudication that Pacewiczh detained her without reasonable suspicion or *"de facto"* arrested her without probable cause is granted.

3. Plaintiff's motion for summary adjudication that Slack and Guillen arrested her for manufacturing methamphetamine without probable cause is granted.

4. Plaintiff's motion for summary adjudication that Wiley ordered her arrest without probable cause is granted.

5. Defendants' motion for summary adjudication that the initial stop and detention of plaintiff was lawful is granted.

6. Defendants' motion for summary adjudication that the search of Woods' pickup truck was lawful is denied.

7. Defendants' motion for summary adjudication that the continued detention of plaintiff was based upon either reasonable suspicion or probable cause is denied.

8. Defendants' motion for summary adjudication that the arrest of plaintiff was lawful is denied.

9. The individual defendants' requests for summary judgment on the grounds of qualified immunity are granted as to the initial stop and detention of plaintiff and are denied as to the further detention of plaintiff, the search of Woods' pickup truck, and the ultimate arrest of plaintiff.

10. Defendants' motion for summary judgment on the grounds that (1) the stop, detention and arrest of plaintiff were lawful, (2) the search of Woods' truck was lawful, and (3) there was a determination by a judicial officer that probable cause existed to arrest plaintiff is denied.

11. Defendants' motion to bifurcate the trial is denied without prejudice.